**UNITED STATES DISTRICT COURT
DISTRICT OF MAINE**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )   **No: 2:24-cr-68-LEW** |
| | ) |
| **WILLIE BANKS** | ) |

**DEFENDANT'S RENEWED MOTION FOR SANCTIONS**

Defendant Willie Banks, by and through undersigned counsel, respectfully moves this Court to impose sanctions based on the Government's failure to disclose exculpatory evidence in violation of the mandates of the U.S. Constitution, *Brady v. Maryland,* 373 U.S. 83 (1963) and its progeny, the Due Process Protection Act, Pub. L. No. 116-182-134 Stat. 894 (Oct. 21, 2020), Rule 5(f) of the Federal Rules of Criminal Procedure, and the court's Order dated June 10, 2024 (ECF. No. 10).

The Government's disclosure obligations are neither aspirational nor discretionary. They are constitutional commands grounded in the fundamental requirement that criminal prosecutions comport with due process and basic fairness. That obligation extends not only to evidence that is directly exculpatory, but also to evidence bearing on the credibility of Government witnesses. As the Supreme Court explained in *Giglio v. United States*, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility" is "incompatible with 'rudimentary demands of justice.'" 405 U.S. 150, 153–54 (1972) (citations omitted), *quoted in United States v. Trump*, 753 F. Supp. 3d 17, 42 (D.D.C. 2024).

1

## I.    INTRODUCTION

The exculpatory evidence in question concerns a surveillance video at the center of the Government's case that captured a shooting on March 13, 2024 at 290 Cumberland Street in Westbrook. According to the Government, the video was simply a private surveillance recording coincidentally captured by a neighbor's camera. What the Government failed to disclose throughout this case is that the neighbor with the security system, J.W.,[1] had actually set up the camera in January 2021 to serve as an investigative tool for Westbrook Police Officer and Maine Drug Enforcement Agent Phil Robinson, in his capacity as a law enforcement officer,  to monitor the activities at 290 Cumberland Street.[2] Since that time, Robinson had unfettered access to the surveillance footage through an account created for him by J.W, and he regularly accessed the footage from his police department-issued cell phone to investigate activities at the residence *without a warrant*.[3] Significantly, the camera captured activities at 290 Cumberland Street from a *non-public vantage point*. In other words, the camera provided law enforcement with a continuous visual perspective unavailable to ordinary members of the public, allowing Robinson to remotely monitor areas and activities associated with the residence over an extended period of time without judicial authorization. Neither the existence of this arrangement nor Robinson's access to and use of the footage was disclosed to the defense or the Court.

---

[1] Throughout this litigation, the Government withheld the neighbor's identity from the defense. However, redaction errors in the Government's productions enabled the defense to ultimately identify J.W. The defense subsequently learned through publicly available online sources that J.W. was employed in public safety for the Town of Windham.
The Government attempted to protect the identity of J.W. in its discovery materials through redaction. However, redaction errors in various reports ultimately revealed his name.
[2] Def.'s Ex.1, FBI ROI dated May 6, 2026.
[3] *Id.*

Continuous, technology-assisted monitoring of a home from a non-public vantage point raises serious constitutional concerns under the Fourth Amendment. *See Carpenter v. United States*, 585 U.S. 296 (2018)*; United States v. Moore-Bush,* 36 F.4th 320 (1st Cir. 2022).

Had the Government disclosed the truth about Robinson's arrangement with J.W. and his 24/7 access to surveillance footage without a warrant, this information would have permitted the defense to challenge: 1) the legality of the surveillance, 2) the credibility and claimed basis of Robinson's identification, 3) the validity of the search warrant, which depended on the video and Robinson's identification, and  4) the integrity of the Government's case as a whole. Instead, the defense litigated suppression under the materially incomplete and misleading impression that the video was merely a fortuitous private recording and that Robinson's identification resulted from a brief review of the footage at the scene. The nondisclosure deprived the defense of the opportunity to litigate whether the surveillance constituted government action requiring constitutional scrutiny. The prejudice is particularly acute because the video and Robinson's identification were the linchpins of probable cause and the sole basis upon which the otherwise indecipherable video was transformed into incriminating evidence against Mr. Banks.

Unlike the prior *Motion for Sanctions*,[4] which the Court denied due to the absence of prejudice,[5] the present violation resulted in actual and substantial prejudice. Sanctions are now required.

If this was the first nondisclosure violation in this case, perhaps the appropriate remedy would be to reopen the issue of suppression based on the newly discovered evidence. However, this is not the first nondisclosure violation, and therefore, the defense submits that a substantial sanction is warranted to deter future Government misconduct.

---

[4] ECF No. 40.
[5] *Order Def.'s Mtn. Sanctions* (ECF No. 45) at 1.

## II.   FACTUAL BACKGROUND RELEVANT TO THE DISCLOSURE VIOLATION.

Because the events underlying Mr. Banks's charge have already been extensively litigated through the defendant's *Motion to Suppress*[6] and *Motion for Sanction*s, this motion will not repeat that history in full here. Mr. Banks incorporates those motions and the related briefings by reference and sets forth below only those additional facts material to the present motion.

### A.  March 13, 2024

Shortly after 8:00 p.m. on March 13, 2024, members of the Westbrook Police Department responded to 290 Cumberland Street to investigate a reported shooting. At the time, Mr. Banks resided there with other individuals. Robinson responded to the scene proclaiming that Mr. Banks was one of the shooters based on his review of surveillance footage captured by J.W.'s security camera. Robinson was the only person involved in the investigation who claimed to identify Mr. Banks in the video. Even J.W., who owned the surveillance system and was personally familiar with Mr. Banks, could *not* identify him from the footage.[7] More importantly, when officers attempted to establish that Mr. Banks "shot back," J.W. repeatedly denied having such knowledge:

> Officer: So, ah, is there proof that Willie shot back?
> J.W.: I don't know any of that.
> Officer: We're hearing that ah
> J.W.: I don't know any of that.

After his arrival on the scene, Westbrook P.D. Detective Jeff Stackpole interviewed Mr. Banks.[8] After speaking with Mr. Banks, Stackpole reviewed the surveillance footage at J.W.'s house.[9] Based on his review of the footage, statements Mr. Banks made to him and Robinson's claimed identification of Mr. Banks on the video, Stackpole drafted a warrant application to search

---

[6] ECF No. 21.
[7] Def.'s Ex. 2, Officer A. Webster Body Camera Video Footage.
[8] Transcript of Hearing on Motion to Suppress held January 16, 2025, ECF No. 35, (hereinafter "Tr.") at 8.
[9] Tr. at 11.

290 Cumberland Street. There can be no question that without the surveillance video, probable cause was lacking.

A state judge authorized the warrant which was executed in the late hours of March 13th. During the search, a firearm was recovered from 290 Cumberland Street, Mr. Banks was arrested and ultimately charged in the instant case with Possession of a Firearm by a Prohibited Person.

**B. Robinson's Claimed Prior Familiarity with Mr. Banks Became the Linchpin of the Government's Probable Cause Theory.**

From the outset of this case, the central issue for the defense has been the reliability and veracity of Robinson's identification of Mr. Banks in the surveillance video. The footage contains no audio and is grainy and low-resolution, rendering meaningful identification exceedingly difficult, if not impossible. Even J.W., who was familiar with Mr. Banks, could *not* identify him from the footage. Robinson alone claimed he could.

The defense squarely raised this issue in its motion to suppress, arguing that the warrant affidavit falsely asserted that Mr. Banks could be identified from the video.[10] And at the suppression hearing, defense counsel reiterated that point, arguing, "There's no one except for Officer Robinson saying that they can identify Mr. Banks based on the video. Without an identification there would be no probable cause."[11]

In response, the Government relied not on the clarity of the footage itself, but on Robinson's asserted prior familiarity with Mr. Banks.[12] The Court credited that assertion, finding Robinson identified the shooter because he "knew him from previous police work."[13] Thus,

---

[10] Mot. Supp. at 8.
[11] Tr. at 36.
[12] *Id.* at 7.
[13] *Order on Def.'s Mtn. Supp.*, ECF No. 44, at 2.

Robinson's claimed prior familiarity with Mr. Banks became the linchpin of the Government's effort to overcome the obvious limitations of the surveillance footage, and suppression was denied.

### C. The Government's Narrative Framed the Surveillance Footage as a Fortuitous Recording from a Neutral Third Party.

Throughout this case, the Government's presentation of the surveillance footage suggested that J.W. was merely a neutral third party who happened to possess a surveillance camera that faced 290 Cumberland Street. According to that narrative, the camera fortuitously captured the shooting on March 13th, and when officers responded on scene, J.W. approached them and played the footage from his cell phone. J.W. also separately shared the video with Robinson, who reviewed it on his phone.[14] In this way, the surveillance footage appeared to be nothing more than a chance recording created and preserved by an uninvolved bystander.

In his written report, Robinson indicates that he reviewed the video footage after arriving on the scene of the incident, stating:

> At approximately 2008 hours I heard Westbrook Police dispatch sending Officers to 290 Cumberland St for multiple 911 calls reporting shots fired inside the residence I responded from the police department and while en route dispatch updated responders explaining the shooter had fled the residence in a white car traveling north on Bridge St from Cumberland St. After checking several areas in town with no luck in locating the suspect vehicle I proceeded to 290 Cumberland St. *There I accessed a surveillance camera previously provided to me by the Westcott family of [] Cumberland St…*Upon reviewing the footage I…recognized Banks on the footage as one of the shooters.[15]

In his affidavit seeking the search warrant, Stackpole states that Robinson reviewed the footage after arriving on the scene:

> MDEA S/A Robinson responded to the scene of the shooting and was able to review surveillance video that captures the shooting.[16]

---

[14] Tr. at 11.

[15] Def.'s Ex. 3, Report of Phil Robinson dated March 14, 2024 at ¶ 2-3 (emphasis added). Later in his report, Robinson seemingly contradicts himself, stating, "After reviewing this surveillance footage, I proceeded to the scene." *Id.* ¶ 3. The defense assumed this was merely a scrivener's error.

[16] Stackpole Aff. ¶ 4, previously admitted at the January 16, 2025 suppression hearing as Def.'s Ex. 2 (hereinafter "Aff.").

S/A Robinson who is familiar with Banks from previous Police contacts, told me that he immediately recognized the male in the video as Banks.[17]

And in the Government's *Opposition to Defendant's Motion to Suppress*,[18] the Government represented, "MDEA S/A Robinson responded to the scene of the shooting and was able to review surveillance video that captures the shooting."[19]

In sum, the reports, the warrant materials and the Government's representations to the Court conveyed a straightforward narrative: Robinson arrived on the scene, reviewed the surveillance footage depicting the incident and identified Mr. Banks based upon prior familiarity with him. The Government never disclosed that Robinson had been granted ongoing remote access to J.W.'s surveillance system in January 2021 and thereafter regularly accessed footage of 290 Cumberland Street from his cell phone for investigative purposes without a warrant. Nothing in the reports, warrant affidavit, or suppression litigation revealed the existence or scope of that arrangement.

### D.  The Ambigous Discovery Reference to "Remote Access."

In the course of its discovery disclosures, the Government produced an investigative report, authored by neither Robinson nor Stackpole, containing the following statement attributed to J.W.:

[J.W.] advised that S/A Robinson had remote access to the cameras.[20]

At the time, the defense understood this ambiguous statement to mean only that J.W. had electronically shared surveillance footage with Robinson, such as through text message, email, or URL link. Nothing in the Government's discovery disclosures suggested that Robinson possessed direct or ongoing access to J.W.'s surveillance system itself. Indeed, the defense's understanding

---

[17] Aff. ¶ 11
[18] ECF No. 24.
[19] *Id.* at 10.
[20] Def.'s Ex. 4, Report of Nicholas Wrigley dated March 15, 2024.

was later reinforced by the Government's representation in its *Opposition* that "[t]he neighbor was able to pull up the video remotely and show it to officers, and a copy of the video was later obtained."[21] That description suggested a conventional transfer of footage initiated by J.W., not independent law enforcement access to the surveillance system.

### E.  The Defense Discovers the Previously Undisclosed Surveillance Arrangement.

In preparation for trial, on April 28, 2026, the defense's investigator conducted a telephonic interview with J.W.[22] During that interview, J.W. disclaimed any memory of the brand name of the surveillance system that had been installed in his home.[23] He told the investigator that he could not remember the name of the company that installed the surveillance system, but recalled that the company had "gone out of business." J.W. then abruptly stated that he no longer wished to speak and told the investigator, "I don't want to give anything up."[24] He nevertheless confirmed that Robinson had remote access to the surveillance system itself.[25] Thereafter, J.W. added words to the effect of, "I know where you are going with this and I don't want to answer any questions."[26]

That information materially altered the factual narrative previously presented in the reports, warrant materials, and suppression litigation. J.W.'s statements suggested that Robinson had ongoing remote access to the surveillance system before March 13, 2024 pursuant to an arrangement with J.W. allowing Robinson to monitor activity at 290 Cumberland Street. Moreover, J.W.'s responses strongly suggested an awareness that the undisclosed nature and scope of that arrangement were significant.

---

[21] *Id.* at 3.
[22] Def.'s Ex. 5, Affidavit of Spencer Tracy dated May 6, 2026.
[23] *Id.* at ¶11.
[24] *Id.* at ¶13.
[25] *Id.* at ¶15.
[26] *Id.* at ¶16.

The defense concluded that this information was materially exculpatory because it directly affected the credibility and basis of Robinson's identification, the nature of the surveillance itself, and the validity of the probable-cause narrative presented during suppression litigation. The defense therefore contacted the Government on April 30, 2026 to raise concerns that this constituted another disclosure failure in the case and that sanctions might be warranted. The Government indicated it would look into the matter.

### F. Robinson's Recent Admissions.

On May 5, 2026, the Government conducted an interview with Robinson; an interview that likely never would have happened but for the defense alerting the Government of its nondisclosure concerns. The next day, the Government produced an FBI Report of Investigation memorializing the May 5th interview.[27] For the first time during the pendency of this case, the Government disclosed:

- Robinson met J.W. around 2008 while serving as a Westbrook Police officer;
- J.W. regularly contacted police to report disturbances and suspicious activity at 290 Cumberland Street;
- In January 2021, J.W. installed a surveillance system with a camera directed toward 290 Cumberland Street;
- J.W. created an account permitting Robinson to remotely access the surveillance system from his department-issued cell phone; and
- Robinson accessed and monitored the camera with "some regularity" prior to March 13, 2024.[28]

Thus, the surveillance footage at issue was not merely a private recording independently generated by a neutral neighbor and later shared with law enforcement after the shooting. Rather, Robinson had ongoing remote access to the surveillance system for more than three years before

---

[27] Def.'s Ex. 6.
[28] *Id.*

9

March 13, 2024, and regularly used that system to monitor activity at 290 Cumberland Street for investigative purposes.

At no point prior to May 6, 2026 did the Government disclose those facts to the defense or the Court, despite the central role Robinson's identification and the surveillance footage played in the suppression litigation and the Government's probable-cause theory.

### G. The Prior Sanctions Order

The Court has already addressed deficiencies in the Government's disclosure practices in this case. Specifically, the Government failed to obtain and disclose materials from Stackpole's personnel file that the Court found possessed clear "impeachment value."[29] In addressing that failure, the Court characterized the Government's approach to its disclosure obligations as "blasé."[30] The Court further emphasized that the Government bears an affirmative obligation to obtain potentially exculpatory and impeachment information from members of the prosecution team, including law enforcement officers involved in the investigation, and warned that a failure to do so risks constitutional violation.[31]

Although the Court ultimately declined to impose the requested sanction of suppression, it did so only because the defense independently uncovered the withheld information and therefore could not establish resulting prejudice.[32] The Court's ruling was thus expressly tied to the absence of prejudice, not the absence of misconduct.

That circumstance no longer exists here. The suppression motion was litigated, and ultimately denied, without the defense or the Court having access to the newly discovered information concerning Robinson's remote access to the surveillance system prior to March 13th

---

[29] *Order*, *supra* n.5, at 7.
[30] *Id.* at 9.
[31] *Id.* at 6-7.
[32] *Id.* at 5-6.

and the true nature of the surveillance at issue. Unlike the personnel materials addressed in the prior sanctions motion, this information goes directly to the core issue litigated at the suppression hearing: Robinson's credibility and whether probable cause existed absent his identification. But more significantly, had the defense known this information, the factual and legal framework of the suppression litigation would have been entirely different. The defense would have challenged the legality of the surveillance video itself. The prejudice is therefore concrete and substantial.

###    III.    LEGAL AUTHORITY FOR SANCTIONS

The Government violates due process when it suppresses evidence favorable to the accused that is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87 (1963). That obligation extends to impeachment evidence. *Giglio v. United States,* 405 U.S. 150, 153-54 (1972); *see also United States v. Bagley,* 473 U.S. 667, 676 (1985). The Government's duty is not limited to information personally known by the assigned prosecutor. Rather, the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 429, 438 (1995). That obligation necessarily includes information known to law enforcement officers participating in the investigation. *Id*.

The Court possesses broad supervisory authority to remedy due process violations and discovery misconduct, and any remedy must be tailored to the nature of the violation and the resulting prejudice. *United States v. Hasting*, 461 U.S. 499, 505 (1983); *United States v. Santana*, 6 F.3d 1, 9 (1st Cir. 1993). The *Hasting* Court delineated three purposes that can justify the use of supervisory power in response to case-related misconduct: "to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct." *Id.* (citations omitted).

11

Congress enacted the The Due Process Protection Act against the backdrop of widespread concern that *Brady* violations had become a recurring problem in federal prosecutions, while courts frequently concluded that they lacked meaningful authority to impose sanctions for violations. *See* 116 Cong. Rec. H4549-4642 (2020) (statement of Rep. Jackson).[33] By codifying and reinforcing the Government's disclosure obligations through Fed. R. Crim. P. 5(f), Congress made clear that *Brady* compliance is not merely aspirational, but an enforceable component of due process that courts are expected to police.

Suppression is an appropriate remedy where governmental misconduct taints the acquisition or use of evidence. *See United States v. Leahey*, 434 F.2d 7, 10–11 (1st Cir. 1970) (recognizing suppression as a proper exercise of supervisory authority where federal agents failed to follow internal procedures, notwithstanding the absence of a technical *Miranda* violation); *State of Maine v. Reed-Hansen*, 207 A.3d 191, 193 (Me. 2019) (affirming suppression for discovery violations even where suppression effectively terminated the prosecution).

Where disclosure violations undermine the integrity of the proceeding itself, dismissal may be warranted, particularly where lesser sanctions have failed to deter misconduct. In *United States v. Osorio*, the First Circuit cautioned, "should the United States Attorney's Office continue in a consistent pattern and practice of negligent nondisclosure, resulting in actual prejudice to defendants, the court might conclude that government misconduct has reached a level warranting 'the extraordinary relief of dismissal.'" 929 F.2d 753, 763 (1st Cir. 1991) (quoting *United States v. Hemmer,* 729 F2.d 10, 13 (1st Cir. 1984)).  *See also, United States v. Diabate*, 90 F. Supp. 2d 140, 144 (D. Mass. 2000) (concluding that dismissal was the only adequate remedy given pattern of discovery misconduct despite previous warnings and prejudice to defendant).

---

[33] Def.'s Ex. 7.

In his prior filings, Mr. Banks detailed the government's pattern of failing to understand its obligations under *Brady* and *Giglio* in other cases.[34] This Court has already admonished the Government regarding its approach to its disclosure obligations in this case. The Court therefore retains broad discretion to impose a remedy sufficient both to cure the resulting prejudice and to protect the integrity of the judicial process. Under the circumstances here, a substantial sanction is warranted.

### IV. THE WITHHELD INFORMATION SUPPORTS A FOURTH AMENDMENT CHALLENGE.

### A. J.W. Acted as an Agent of Law Enforcement Under the Fourth Amendment.

The Fourth Amendment applies where a private party acts as an instrument or agent of the government. *United States v. Jacobsen*, 466 U.S. 109, 113-14 (1984); *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971). The First Circuit considers three factors to determine whether a private party acts as an agent of the Government:

(1) the extent of the government's role in instigating or participating in the search;
(2) its intent and the degree of control it exercises over the search and the private party; and
(3) the extent to which the private party aims primarily to help the government or to serve its own interests."

*United States v. Tapley*, 637 F. App'x 619, 621 (1st Cir. 2016) (internal citations omitted).

Here, the *Tapley* factors support the conclusion that J.W. acted as an instrument or agent of the Government rather than as a purely private citizen acting independently. First, Robinson's role in participating in the surveillance was substantial. According to him, J.W. installed the surveillance system in January 2021 with one camera specifically directed toward 290 Cumberland Street, and J.W. then created an account permitting Robinson to remotely access the system from his cellphone. Robinson admitted that he used that access with "some regularity" to monitor the

---

[34] Supplemental Brief Regarding Appropriate Sanctions for *Giglio* Violations (ECF No. 40) at 10-11.

activity at the residence in connection with criminal investigations and complaints. Thus, this was not a situation in which law enforcement merely received footage after the fact from a private homeowner acting independently. Rather, the surveillance system was configured in a manner that affirmatively enabled ongoing law enforcement monitoring of the target residence over a period of years.

Second, the degree of Robinson's involvement and control was significant. Robinson possessed direct remote access to the surveillance system and could monitor both live and archived footage without obtaining a warrant or seeking contemporaneous permission each time he accessed the system. The surveillance was therefore not episodic or incidental. Instead, the arrangement effectively gave law enforcement continuing investigative use of a surveillance camera focused on the non-public area of a specific residence. The Government's own report confirms Robinson regularly utilized the system as part of his investigative activities concerning 290 Cumberland Street. These facts demonstrate far more than passive receipt of information from a concerned citizen.

Third, the available evidence strongly suggests that J.W.'s actions were undertaken primarily to assist law enforcement rather than solely to advance private interests. J.W. regularly contacted police regarding alleged disturbances and suspicious activity at 290 Cumberland Street, installed a camera directed at the non-public area of that residence, and provided Robinson ongoing remote access for investigative monitoring. Moreover, J.W. was employed in public safety for the Town of Windham, further distinguishing this case from one involving a purely private citizen independently sharing surveillance footage with police. When questioned by the defense investigator, J.W. stated, "I don't want to give anything up" and "I know where you are going with this and I don't want to answer any questions," statements suggesting an awareness that the

surveillance arrangement functioned as part of an ongoing law-enforcement effort rather than merely a private home-security measure.

Under these circumstances, the surveillance cannot fairly be characterized as a purely private search later shared with police. Robinson's involvement in establishing, accessing, and utilizing the surveillance system was sufficiently extensive that the Fourth Amendment applies.

**B. Law Enforcement's Warrantless, Continuous Surveillance of 290 Cumberland Street Violated the Fourth Amendment**.

Continuous, technology-assisted surveillance of a home from a non-public vantage point implicates the "privacies of life" protected by the Fourth Amendment. *See Carpenter v. United States*, 585 U.S. 296, 305-08 (2018) (acquisition of historical cell-site location information without a warrant violated the Fourth Amendment). In *Carpenter*, the Supreme Court recognized that prolonged technological monitoring allows the Government to obtain a detailed and revealing picture of a person's movements and associations in a manner fundamentally different from ordinary observation. *Id.* at 311-13. The Court emphasized that the Fourth Amendment must account for advancing technology that enables law enforcement to achieve a degree of monitoring previously impossible through traditional methods alone. *Id.*

Those concerns are directly implicated here. Unlike an officer occasionally observing a residence from a public street, Robinson possessed the ability to remotely monitor the residence continuously over a period of years through a fixed surveillance system positioned on neighboring private property. Significantly, the surveillance camera captured activity from a vantage point unavailable to ordinary members of the public. Robinson therefore obtained a persistent visual presence focused on a private residence without judicial oversight, without temporal limitation, and without the practical constraints that inherently limit traditional police surveillance. Such prolonged, technology-assisted monitoring allowed law enforcement to repeatedly observe the

15

activities associated with the residence in a manner far exceeding what would have been feasible through ordinary in-person observation.

The First Circuit's *en banc* decision in *United States v. Moore-Bush,* 36 F.4th 320, 359 (1st Cir. 2022) (Barron, C.J., concurring), further underscores the constitutional significance of this type of surveillance. Although the court ultimately resolved the case on good-faith grounds citing *United States v. Bucci*, 582 F.3d 108 (1st Cir. 2009), multiple judges recognized that long-term pole-camera surveillance of a home presents serious Fourth Amendment concerns because continuous technological monitoring can reveal deeply private details regarding the occupants' associations, habits, routines, and activities. *Id.* at 328-29. Those concerns are even more pronounced here, where the surveillance occurred through a camera system focused on a non-public vantage point, made continuously accessible to law enforcement.

The Government may attempt to characterize the surveillance as merely the observation of areas visible from outside the home. But *Carpenter* and *Moore-Bush* make clear that the Fourth Amendment is implicated where technology enables the Government to engage in prolonged, comprehensive, and automated monitoring that qualitatively transforms ordinary observation into a powerful surveillance tool. That is precisely what occurred here.

Accordingly, the surveillance arrangement between Robinson and J.W. constituted a warrantless Fourth Amendment search, and the Government's failure to disclose that arrangement deprived the defense of the opportunity to litigate the legality of the surveillance and the derivative validity of the warrant obtained thereafter.

## V.    A PASSING REFERENCE TO "REMOTE ACCESS" DID NOT CONSTITUTE MEANINGFUL DISCLOSURE.

After the defense raised its concerns regarding the Government's failure to disclose the true nature of the surveillance arrangement, the Government responded by citing the single

sentence in the one investigative report noting J.W.'s statement that "Robinson had remote access to the camera."[35],[36] The Government's reliance on a single passing reference buried within one report out of approximately 973 pages of discovery does not cure its nondisclosure obligation, particularly where the significance of the information was never disclosed until May 6, 2026 and the Government simultaneously presented an entirely different narrative throughout suppression litigation. That isolated statement that "J.W. advised that S/A Robinson had remote access to the camera" in no way disclosed the true nature, scope, or constitutional significance of the surveillance arrangement. *Brady* does not permit the Government to disclose materially exculpatory information in a cryptic or misleading manner while withholding the context necessary for the defense to understand its significance. A disclosure is not meaningful merely because a fragment of the underlying fact appears somewhere in discovery. The question is whether the Government disclosed the information in a manner that allowed the defense to recognize and effectively use it. Here, it plainly did not.

Indeed, the Government's own conduct demonstrates the insufficiency of the passing reference. Only after the defense independently interviewed J.W. and raised concerns regarding nondisclosure did the Government conduct an interview of Robinson and produce the May 6, 2026 FBI report revealing, for the first time, the scope and investigative purpose of Robinson's access to the surveillance system. If the earlier passing reference truly constituted full disclosure, there would have been no need for the Government to subsequently clarify that Robinson had remotely monitored 290 Cumberland Street "with some regularity" for years before March 13, 2024.

---

[35] Def.'s Ex. con4, *supra* n.20.
[36] The Government also cited Robinson's report and another investigator's report, both of which are equally unavailing.

### VI.    SANCTIONS ARE REQUIRED

The Government's failure to disclose the true nature of the surveillance in this case deprived Mr. Banks of a fair opportunity to challenge the Government's evidence and litigate suppression on a complete factual record. By withholding the circumstances surrounding Robinson's ongoing remote access to the surveillance system, the Government prevented the defense from challenging the legality of the surveillance, the credibility and basis of Robinson's identification, and the validity of the probable-cause narrative presented to the Court. This is precisely the type of unfairness the Due Process Clause is intended to prevent. Indeed, this Court has already identified serious deficiencies in the Government's fulfillment of its disclosure obligations and previously cautioned the Government regarding that conduct.

Nor is this merely a past disclosure failure. Even after disclosing the evidence demonstrating that Robinson remotely monitored 290 Cumberland Street for over three years for investigative purposes through a residential surveillance system, the Government has continued to defend both the surveillance and Robinson's identification while minimizing the significance of facts that fundamentally alter the basis upon which suppression was litigated. Under these circumstances, the Court is not confronted with an isolated oversight, but with continuing misconduct that has undermined the integrity of these proceedings.

Accordingly, sanctions are necessary both to remedy the prejudice suffered by Mr. Banks and to protect the integrity of the judicial process. The defense submits that dismissal with prejudice is warranted. At a minimum, however, the Court should suppress the surveillance footage, Robinson's identification of Mr. Banks, and all evidence derived from the resulting search.

DATED: May 8, 2026                                  */s/ Heather Gonzales*_____
                                                   Heather Gonzales
                                                   Attorney for Defendant
                                                   Senior Litigator, Federal Defender's Office
                                                   P.O. Box 595
                                                   Portland, Me 04112-0595
                                                   207-553-7070
                                                   FAX: 553-7017
                                                   heather_gonzales@fd.org

## CERTIFICATE OF SERVICE

I, Heather Gonzales, attorney for Willie Banks, hereby certify that I have served electronically, a copy of the within **DEFENDANT'S RENEWED MOTION FOR SANCTIONS** upon Assistant United States Attorney Peter Brostowin, Esq., via the ECF system.

DATE:        May 8, 2026                             */s/ Heather Gonzales*
                                                    Heather Gonzales